IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **LARRY JOHNSON**, <br><br>   Plaintiff <br><br>v. <br><br>**GUARDIAN MANAGEMENT and UPTOWN TOWERS**, <br><br>   Defendants. | Case No. 3:19-cv-485-SI <br><br> **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

Paul W. Conable and Sadie Y. Concepción, TONKON TORP LLP, 888 SW Fifth Avenue, Suite 1600, Portland, OR 97204. Of Attorneys for Plaintiff.

Christopher J. Drotzmann and Sean Douglas McKean, DAVIS ROTHWELL EARLE & XÓCHIHUA PC, 200 SW Market Street, Suite 1800, Portland, OR 97204. Of Attorneys for Defendants.

**Michael H. Simon, District Judge.**

  Plaintiff, who is disabled, alleges that Defendants, who provide and manage Section 8 low-income housing, unlawfully discriminated against Plaintiff in violation of the Fair Housing

PAGE 1 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

Act (FHA), 42 U.S.C. § 3604(f).[1] Among other things, under the FHA, it is unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of . . . rental of a dwelling, or in the provision of service or facilities with such dwelling, because of a handicap of . . . that person." 42 U.S.C. § 3604(f)(2)(A). Unlawful discrimination includes "a refusal to make reasonable accommodations in rules policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to enjoy the dwelling." 42 U.S.C. § 3604(f)(3)(B).

On February 7, 2022, the Court held a bench trial. The Court weighed and evaluated all evidence in the same manner that it would instruct a jury to do and has fully considered the legal arguments of counsel. The Court now makes the findings of fact and conclusions of law stated below. Any finding of fact that constitutes a conclusion of law also is adopted as a conclusion of law, and any conclusion of law that constitutes a finding of fact similarly is adopted as a finding of fact.

In the opinion of the Court, the facts found are all supported by the record, even though the Court might not provide specific record citations. Also, unless otherwise noted, when evidence is subject to an objection and the Court has relied on that evidence, the Court has overruled the objection for the reason or reasons identified either by the Court or, if the Court is silent, by the party offering the evidence in response to the objection. When the Court has declined to consider evidence subject to an objection, the Court may state its basis for sustaining the evidentiary objection; alternatively, the Court simply may have found that the evidence subject to objection was not persuasive, thus making the objection moot. All objections to

---

[1] The Fair Housing Amendments Act of 1988 (FHAA) amended the FHA. The amendments strengthened the Act's provisions to combat housing discrimination and neighborhood segregation. Pub. L. No. 100-430, 102 Stat. 1619 (1988) (amending 42 U.S.C. §§ 3601-3619 (1982)).

evidence that the Court has not relied on and all procedural objections not expressly addressed are denied as moot.

## BACKGROUND

In 1974, Congress added the Section 8 housing program to the United States Housing Act of 1937 "[f]or the purpose of aiding low-income families in obtaining a decent place to live." 42 U.S.C. § 1473f. Section 8 gives eligible families either "tenant-based" or "project-based" rent subsidies administered through a state or local project housing authority (PHA) using funds provided by the U.S. Department of Housing and Urban Development (HUD). *Park v. Vill. Apartment Tenants Ass'n v. Mortimer Tr.*, 636 F.3d 1150, 1152-1153 (9th Cir. 2011); 24 C.F.R. §§ 983.5(a)-(b), 982.4(b). Project-based Section 8 housing helps families who live in specific housing developments or units. 42 U.S.C. § 1437f(f)(6). Under Section 8's project-based program, a PHA contracts with a property owner and makes rent subsidy payments, called a housing assistance payment (HAP), for specific housing developments or units and for specified terms. 24 C.F.R. §§ 983.5(a)(1)-(3), 983.3(b). The agreement between a PHA and the property owner is called a "HAP Contract." During the term of a HAP Contract, the PHA makes HAPs to the property owner for the units leased and occupied by approved families. *Id.* §§ 983.5(a)(4), 983.202.

In the Section 8 housing program, low-income participants pay 30 percent of their adjusted income for rent, and the housing authority, or PHA, pays the remainder. *Id.* § 5.628(a). HUD calculates a tenant's adjusted annual income using HUD income counting rules. Annual income is defined broadly as "all amounts, monetary or not." *Id.* § 5.609(a). Income includes "compensation for personal services" that "[g]o[es] to, or on behalf of, the family head or spouse (even if temporarily absent) or to any other family member." *Id.*, §§ 5.609(a)(1); 5.609(b)(a). Income does not include amounts specifically excluded under the regulation. *Id.* § 5.609(a)(3).

PAGE 3 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

The regulations exclude sixteen categories of income from the calculation of qualifying annual income. Relevant to this lawsuit is the exclusion of income received by a "live-in aide," as defined in 24 C.F.R. § 5.403. *Id.* § 5.609(c)(5). Housing providers who participate in a Section 8 project-based assistance program must reexamine and redetermine family income and composition annually. *Id.* § 5.657.

Under the HUD rules for Section 8 housing, a live-in aide defined as a person who: (1) is "essential to the care and well-being" of an elderly or disabled person; (2) "is not obligated for the support" of the elderly or disabled person; and (3) "[w]ould not be living in the unit except to provide the necessary supportive services" to the elderly or disabled person. 24 C.F.R. § 5.403. The Court has previously ruled that there is no categorical exclusion of spouses under this definition of live-in aide within the HUD regulatory scheme. *See* ECF 48 at 16-17.

## FINDINGS OF FACT

The Court finds the following facts by a preponderance of the evidence.

1. Plaintiff Larry Johnson (Mr. Johnson) is a resident of Portland, Oregon. He is a low-income senior with significant health needs that impair his daily functioning, constituting a disability. Defendant Uptown Towers (Uptown Towers)[2] is a rental community, including an apartment building, that participates in a Section 8 low-income housing assistance program through HUD. Defendant Guardian Management (Guardian) is a company that manages residential rental buildings, including the Uptown Towers apartment building.

2. HUD has determined that Mr. Johnson qualifies for subsidized housing under Section 8 if only his income is considered. As a result of his disabilities, Mr. Johnson also

---

[2] Plaintiff represented himself (*pro se*) when he filed the Complaint in this action and did not correctly name Defendant Uptown Tower Apartments, LLC. Plaintiff is now represented by counsel.

qualifies for financial assistance through the Medicaid Independent Choices Program (ICP), administered by the Oregon Department of Human Services (DHS), In-Home Service. DHS has determined that Mr. Johnson's disabilities currently qualify him to receive in-home services of 60 hours per pay period, or 30 hours per week.

3.      In 2015, Mr. Johnson moved into Uptown Towers as a resident. The full contract rate for Mr. Johnson's unit at Uptown Towers is $1,552. Mr. Johnson pays about $255 a month for the unit. From the time he moved in, Mr. Johnson periodically submitted "reasonable accommodation" requests, including seeking permission to have a "live-in aide." Through November 2018, Defendants consistently approved Mr. Johnson's requests.

4.      Mr. Johnson married Rowena Perpiñan (Mrs. Johnson) in the Philippines on April 8, 2016. Mrs. Johnson is not a United States citizen. After their marriage, Mr. Johnson returned to the United States and Mrs. Johnson remained in the Philippines. In the fall of 2017, Mr. and Mrs. Johnson jointly signed a U.S. immigration document in which Mr. Johnson stated: "My wife Rowena Perpiñan Johnson speaks fluent English and is a schoolteacher in the Philippines. I wish to relocate to the Philippines where she will retain her teaching career and wish to have her approved for a marriage visa to travel between our countries."

5.      In November 2018, Mrs. Johnson took a temporary leave of absence from her job as a teacher to travel to Portland. She did not have a plane ticket for return travel. She intended to help Mr. Johnson get his affairs in order so they could return to the Philippines and live there together. While Mrs. Johnson was en route, Mr. Johnson suffered a cardiac event that required his hospitalization.

6.      Mr. Johnson's cardiac event made it inadvisable for him to move to the Philippines. After his cardiac event, Mr. Johnson asked Mrs. Johnson to remain in Portland and

PAGE 5 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

live with him as his live-in aide. She agreed to do so. According to both Mr. Johnson and Mrs. Johnson, before Mr. Johnson's cardiac event in November 2018, Mrs. Johnson never intended to move to the United States. Rather, Mrs. Johnson intended that Mr. Johnson would move to the Philippines, where she could keep her job as a teacher and her family could assist in Mr. Johnson's care.

7. Since November 2018, Mrs. Johnson has been living with Mr. Johnson in his apartment in Uptown Towers and performing the duties of his live-in aide. Mrs. Johnson is an hourly in-home service provider under the DHS In-Home Services program and is employed by Mr. Johnson. Mrs. Johnson is paid for 30 hours per week of in-home care services for Mr. Johnson.

8. Mrs. Johnson provides care to Mr. Johnson at unpredictable hours and intervals, often at night. Mr. Johnson requires assistance taking his medication, toileting, bathing, eating, and with his cognitive functions, among other things. If Mr. Johnson no longer required her care, Mrs. Johnson would return to the Philippines.

9. Mr. Johnson receives about $12,000 a year in disability payments from the Social Security Administration. Before coming to the United States, Mrs. Johnson made the equivalent of about $7,000 a year as a teacher in the Philippines. Mrs. Johnson now makes approximately $25,000 a year through the ICP for serving as Mr. Johnson's caregiver. Mr. Johnson gives Mrs. Johnson approximately $500 a month to pay bills and for household expenses. Mrs. Johnson has a cashback credit card and when she pays bills on that credit card—such as for Internet service or insurance—Mr. Johnson reimburses her. Mrs. Johnson sends a portion of the money that she makes as Mr. Johnson's caregiver back to her family in the Philippines.

PAGE 6 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

10.     If Mrs. Johnson's income were included in calculating the household income, Mr. Johnson's rent would increase from about $255 a month to around $750 a month, or more.

11.     In November 2018, Mr. Johnson submitted to Defendants a "reasonable accommodation request" to have Mrs. Johnson considered as Mr. Johnson's live-in aide. Pursuant to that request, Mr. Johnson filled out a portion of a form entitled "Verification for a Reasonable Accommodation/Modification by Qualified Individual." Mr. Johnson signed the bottom portion of that form, titled "Consent to Verification." Mr. Johnson gave his permission for Uptown Tower "to obtain written verification" from Mr. Johnson's healthcare provider regarding his request for a reasonable accommodation. Mr. Johnson identified Abdul Ali Wright (Mr. Wright) as his healthcare provider. Mr. Wright is one of Mr. Johnson's healthcare providers at the Multnomah County Health Department. Mr. Johnson's signature is dated November 11, 2018. Mr. Wright filled out another section of the form. In his section, Mr. Wright stated: "I understand the person listed above has requested the following accommodation/modification: Live-in Caregiver." Mr. Wright checked a box indicating that Mr. Johnson's requested accommodation "[i]s _related_ to his/her disability and is _necessary_ in order to provide him or her with full and equal use and enjoyment of the rental unit." (emphases in original). Mr. Wright signed and dated the form November 21, 2018.

12.     Dr. Judith Becher (Dr. Becher) of the Multnomah County Health Department filled out a form titled, "Live-In Aide Request Verification" regarding Mr. Johnson's request. The following question appears on the form: "In your professional opinion, does the household member need the services of a live-in aide in order to have the same opportunity that a non-disabled individual has to use and enjoy the site?" Next to that question, Dr. Becher checked

the box labeled "yes." Dr. Becher signed and dated this form February 4, 2019. On February 5, 2019, the Multnomah County Health Department faxed that form to Guardian Management.

13.    Defendants denied Plaintiff's request to have Mrs. Johnson considered a live-in aide based on their belief that, as Mr. Johnson's spouse, she did not qualify as a live-in aide under HUD regulations. Defendants have not, however, re-calculated Mr. Johnson's rent to take Mrs. Johnson's income into account, nor have Defendants attempted to remove Mr. Johnson from the unit.

14.    Mr. Johnson was convicted in 2002 of multiple felonies, including Mail Fraud and Making False and Fraudulent Statements to an Agency of the United States.[3] Based on these convictions as well as the Court's observations of Mr. Johnson's demeanor during the trial held by video-conference, the Court finds that Mr. Johnson's testimony is not credible.

15.    Having observed and considered the testimony of Mrs. Johnson by video-conference, the Court concludes that she provided credible testimony.

## CONCLUSIONS OF LAW

The Court makes the following conclusions of law.

---

[3] The Court receives these convictions in evidence. The Federal Rules of Evidence (FRE) permit a party to attack a witness's character for truthfulness by evidence of a criminal conviction for a felony. FRE 609(a)(1). When such a conviction is more than 10 years old, however, it is admissible only if: "(1) its probative value, supported by specific facts and circumstances, substantially outweighs its prejudicial effect; and (2) the proponent gives an adverse party reasonable written notice of the intent to use it so that the party has a fair opportunity to contest its use." FRE 609(b). The Court considers the following facts in determining whether the probative value of an older conviction substantially outweighs its prejudicial effect: (1) the impeachment value of the prior crime; (2) the point in time of the conviction and the witness' subsequent history; (3) the similarity between the past crime and the behavior at issue; (4) the importance of the witness's testimony; and (5) the centrality of the credibility issue. *Tipton v. News-Review Pub. Co.*, 2012 WL 2679454, at *3 (D. Or. July 6, 2012) (citing *U.S. v. Pritchard*, 973 F.3d 905, 908-09 (11th Cir. 1992)). The Court finds now that each of these factors weighs in favor of admitting Mr. Johnson's prior felony convictions in evidence based on fraud and making false statements, and so unconditionally receives these convictions.

1. Under the FHA, it is unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of . . . rental of a dwelling, or in the provision of service or facilities with such dwelling, because of a handicap of . . . that person." 42 U.S.C. § 3604(f)(2)(A). Unlawful discrimination includes "a refusal to make reasonable accommodations in rules policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to enjoy the dwelling." 42 U.S.C. § 3604(f)(3)(B).

2. To prevail in a claim of disability discrimination under § 3604(f), a plaintiff must prove the following elements:

> 1. Plaintiff suffers from a handicap, as defined in 42 U.S.C. § 3602(h);
>
> 2. Defendants knew or should reasonably be expected to know of Plaintiff's handicap;
>
> 3. An accommodation may be necessary to afford Plaintiff an equal opportunity to use and enjoy the dwelling; and
>
> 4. Defendants unreasonably refused to make a reasonable accommodation.

*See DuBois v. Ass'n of Apartment Owners of 2987 Kalakaua*, 453 F.3d 1175, 1179 (9th Cir. 2006); *U.S. v. Cal. Mobile Home Park Mgmt. Co.*, 107 F.3d 1374, 1380 (9th Cir. 1997). "The reasonable accommodation inquiry is highly fact-specific, requiring case-by-case determination." *DuBois*, 453 F.3d at 1179 (quotation marks omitted).

3. Under Section 8, the income of a live-in aide for a person is not considered when calculating the person's qualifying income. The rules applying Section 8 define a "live-in aide" as someone who: (1) is essential to the care and well-being of an elderly or disabled person; (2) is not obligated for the support of the elderly or disabled person; and (3) would not be living in the unit except to provide necessary support services to the elderly or disabled person. *See* 24

C.F.R. § 5.609(c)(5) (excluding from "annual income" the income of a live-in aide); 24 C.F.R. § 5.403 (defining "live-in aide").

4. Mr. Johnson is disabled within the meaning of 24 C.F.R. § 5.403.[4]

5. It was not clear before trial whether Defendants contested that Mrs. Johnson was essential to Mr. Johnson's care and well-being, as required by the first prong of the definition of "live-in aide." At trial, however, Defendants made clear that they challenge do challenge whether Mrs. Johnson meets the first prong of the live-in aide definition.

6. Mr. Johnson's care providers at the Multnomah County Health Department concluded and so informed Guardian Management that Mr. Johnson needed the assistance of a live-in aide to use and enjoy the unit. The fact that DHS determined, prior to Mr. Johnson's cardiac event, that ICP would pay for only 30 hours of in-home care a week is not dispositive on the issue of whether Mrs. Johnson's live-in care is essential to Mr. Johnson under the definition of a live-in aide. Mrs. Johnson performs essential care tasks for Mr. Johnson at unpredictable hours, often in the evening. That level of assistance is essential to Mr. Johnson's care and well-being. Based on the paperwork submitted by Mr. Johnson's Multnomah County healthcare providers, coupled with Mrs. Johnson's testimony regarding the degree of care she provides, Mrs. Johnson is essential to the care and well-being of Mr. Johnson for purposes of the first prong of the definition of a live-in aide.

7. The parties do not dispute that Mr. Johnson is not obligated for the support of Mr. Johnson, as required by the second prong of the live-in aide definition.

8. Mrs. Johnson would not be living in Mr. Johnson's unit at Uptown Towers except to provide necessary support services to Mr. Johnson, as required by the third prong of the live-in

---

[4] Mr. Johnson is also elderly, under the definition provided in 24 C.F.R. § 5.403.

PAGE 10 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

aide definition. As described above, Mrs. Johnson did not intend to reside in Mr. Johnson's unit at Uptown Towers before November 2018. Prior to Mr. Johnson's cardiac event, Mrs. Johnson intended that Mr. Johnson would return with her to the Philippines. If Mr. Johnson no longer required her care, Mrs. Johnson would return to the Philippines.

9.   Defendants argue that Mrs. Johnson does not qualify as a live-in aide because she and Mr. Johnson engage in activities other than those strictly related to the care and well-being of Mr. Johnson. As described in the Court's previous order, the applicable regulations expressly anticipate that and actually encourage family to act as live-in aides for their family members. ECF 48, at 13 ("The HUD regulation defining live-in aides, however, does not exclude a spouse or family member from acting as a live-in aide. Indeed, when the definition was established, the agency intentionally deleted proposed text that would have precluded spouses and family members from serving as live-in aides specifically to encourage such persons to serve as live-in aides." (citing *Section 8 Certificate and Voucher Programs Conforming Rule: Admissions*, 59 Fed. Reg. 36662, 36665 (July 18, 1994))). The regulations and the history of those regulations also do not support Defendants' contention that, to meet the regulatory definition, a live-in aide with a preexisting marital relationship to the person assisted cannot continue to maintain that relationship after becoming a live-in aide. Defendants cite no authority for their conclusion that Mrs. Johnson cannot be a live-in aide because Mr. and Mrs. Johnson enjoy each other's company as husband and wife and engage in activities other than those associated strictly with Mr. Johnson's care.

10.   In summary, Mrs. Johnson meets all three prongs of the definition of a live-in aide, found in 24 C.F.R. § 5.403: she is essential to Mr. Johnson's care and well-being, she is not obligated to care for him, and she would not be living in the unit but for his care needs.

PAGE 11 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

11.     An accommodation for Mrs. Johnson to be considered Mr. Johnson's live-in aide is necessary to afford Mr. Johnson an equal opportunity to use and enjoy the unit, pursuant to 42 U.S.C. § 3604(f).

12.     Because Defendants have not raised Mr. Johnson's rent or required him to leave, they have not refused Mr. Johnson's requested accommodation, as required to sustain a discrimination claim under 42 U.S.C. § 3604(f). *See Dubois*, 453 F.3d at 1179 ("The Condominium Association never required Einstein to leave and thus never refused to make the requested accommodation, which is one of the essential elements of the FHA claim. … Since the Condominium Association never refused to make the requested accommodation, plaintiffs' FHA claim necessarily failed."). Accordingly, Mr. Johnson has not demonstrated that Defendants have refused to make his requested accommodation and, for that reason, Mr. Johnson's FHA discrimination claim fails.

## CONCLUSION

Based on the evidence presented at trial and the record in this case, the Court finds and declares that Mrs. Johnson meets the requirements of a live-in aide set out 24 C.F.R. § 5.403. The Court also finds that Defendants did not discriminate against Mr. Johnson based on his disability as prohibited by 42 U.S.C. § 3604(f).

**IT IS SO ORDERED**.

DATED this 10th day of February, 2022.

*/s/ Michael H. Simon*
Michael H. Simon
United States District Judge